# CHARLESTON.

## MARY A. BENNETT v. THEODORE C. BENNETT.

Submitted November 15, 1922.    Decided November 28, 1922.

1.  TRUSTS—*Express Trust Held Created in Favor of Wife for One-half of Net Profits Derived on Resale of Wife's Land Sold at Trustee's Sale.*

    A proposition is made in writing to the husband proposing the purchase of his wife's separate real estate at a trustee's sale, then about to be made, immediately following personal negotiations with the wife leading to the propostion in writing, wherein proponent agrees to buy the land at the trustee's sale, and rent the same to the husband, and when the land should be resold by him to divide equally the profits with the husband; which proposition is accepted by husband and wife, and in pursuance thereof the land is bought in by the proponent at the trustee's sale and the deed made to him.    An express trust is thereby created in favor of the wife for one half of the net profits derived from a subsequent sale of the land.    (p. 397).

2.  SAME—*Statute of Frauds Not Applicable to Creation of Express Trust as Basis of Equitable Interest in Real Estate by Parol Agreement.*

    The statute of frauds does not apply to an express trust as the basis of an equitable interest in real estate.    (p. 397).

3.  LIMITATION OF ACTIONS—TRUSTS—*Laches Not Imputed to Beneficiary of Express Trust Until Trustee Repudiates Trust to Beneficiary's Knowledge; Limitation as Against Such Beneficiary Run From Repudiation of Trust and Notice to Him.*

    Where there is an express trust ordinarily laches cannot be imputed to the beneficiary until the trustee repudiates the trust, and such repudiation is communicated to the beneficiary. Nor will the statute of limitations begin to run until such repudiation and notice occurs.    (p. 398).

4.  EQUITY—*Will Apply Statute of Limitations to Claims, Where There is Concurrent Jurisdiction in Law and Equity.*

    Where there is concurrent jurisdiction in law and equity for the assertion of claims, equity will apply the statute of limitations as a bar to such claims, following the law, and will recognize and apply exceptions to the running of the statute. (p. 398).

5.    Limitation of Actions—*Limitations as to Personal Actions Held Applicable to Personal Actions of Married Woman Affecting Her Separate Personal Property.*

The limitation of time for bringing personal actions prescribed in chap. 104, Code, applies to personal actions of a married woman which affect her sole and separate personal property; and sec. 16 of said chapter does not except her from the operation thereof. (p. 402).

6.    Same—*Action by Beneficiary of Express Trust Against Trustee, who Repudiated Trust, to be Brought Within Ten Years From Date of Repudiation.*

Where, under the terms of the express trust set out in the first point of the syllabus, the surface, coal, and all but 1/16 of the royalty of the oil and gas, have been sold and conveyed, at different times, by the holder of the legal title, and he refuses to account to the beneficiary for one half of the net profits, repudiates the trust and denies liability, the period of limitation in which the beneficiary can sue is 10 years from the date of such repudiation and denial. (p. 408).

7.    Perpetuities—*Agreement by Purchaser at Trustee's Sale to Divide Profits on Resale With Owner Not Void, as Against Rule Against Perpetuities.*

The contract set out in the first point of the syllabus is not void and unenforceable as violating the rule against perpetuities. (p. 409).

Appeal from Circuit Court, Harrison County.

Suit by Mary A. Bennett against Theodore C. Bennett. Decree for plaintiff, and defendant appeals.

*Affirmed.*

*Charles G. Coffman, Philip P. Steptoe,* and *Homer W. Williams,* for appellant.

*T. M. McIntire,* and *John Ross, Jr.,* for appellee.

Lively, Judge:

This suit involves the right of plaintiff, Mary A. Bennett, to participate in the net proceeds of land sold by defendant, T. C. Bennett, under an agreement made in the year 1887,

by them, under which defendant took the legal title to the land, with power to sell.

Plaintiff was the owner by inheritance of a tract of 128 acres of land lying in Sardis district of Harrison county, on which she and her husband Ai P. Bennett had resided for many years. They contracted debts in the purchase of other land, and secured payment by three deeds of trust to Cunningham, trustee, between 1882 and 1885, for sums aggregating about $700.00, on the 128 acres. In 1887 Cunningham, trustee, advertised the land, and Ai Bennett, being confined to his home by rheumatism, plaintiff entered into negotiations with defendant, a brother of her husband, and who conducted a country store at Brown about 5 miles distant from the land, for the purpose of paying the indebtedness and protecting her interest in her land. She says it was understood and agreed between them that defendant would purchase the land, pay what indebtedness was against it, including expenses of sale, and when he resold the land the profits would be divided evenly between them, and that plaintiff could remain on the land and keep it up. There was some negotiation of this character, as defendant then wrote a letter to his brother which was carried by plaintiff to her husband and which is as follows:

March 11, 1887.

"Ai, glad to hear that you are getting better. The way that I am going to do in regard to the land is just this, if I buy it at all I will buy it at public sale and will let you stay on and give you, a good chance. That is I will rent you the house, garden, corn ground and pasture for one horse and one cow, and let you have one-half of the apples at a price that we can agree upon. In other words I will give you a good show. And then when I sell it we will divide the profits even.

That would certainly give you a good chance, and now if you are not entirely satisfied with the above proposition why let me know, for I do not want the land. Read the above carefully, for if I buy the land I never want a hard thought.

Yours,

T. C. BENNETT."

This proposition was accepted. At the trustee's sale, defendant bid in the land for $925.00 which was $67.94 more than the debts and costs of sale; he paid $500.00 cash and executed his note for $357.06 and plaintiff and her husband, Ai, executed a receipt to the trustee for the remaining $67.94. The trustee's deed to defendant bears date March 22, 1887 and recites the consideration and payments as above. Plaintiff says the release, or receipt to the trustee was given by her to defendant for the trustee a few days after the sale, and that she received no consideration therefor. She did not attend the sale, and executed the receipt in furtherance of the understanding that defendant should pay only the debts and costs. Defendant frankly says he does not have much recollection as to how the receipt was given, but thinks that he paid the entire sum of $925.00, by crediting the $67.94 on rents. No rents were then due or in existence; and it is clear from the recitals in the deed that he paid to the trustee only $857.06. Plaintiff and her family continued to reside on the land until about March 1, 1890, when they moved away, some differences having arisen between them and defendant over the extent of farming and occupancy of the land for agricultural purposes. Before moving, plaintiff says she approached defendant for the purpose of parting with all her interest in the land to him and proposed to take one-half of the difference between $2000.00 (the price at which he was offering the land for sale), and the sum he had paid, which offer he refused, but offered her $200.00, which she in turn refused. Defendant says he had no such offer from her, and made no proposition to purchase from her at any price. Defendant took possession of the land and rented it to various tenants, purchased an adjoining tract of 32 acres, and offered the two tracts for sale. Plaintiff and her family lived in the vicinity and cordial relations existed between them and defendant. About 1898 a development for oil and gas began in that neighborhood, and defendant then executed an oil and gas lease on the land to an oil company, and afterwards, in 1900, deeded one-half of the royalty in the two tracts (128 acres and 32 acres adjoining) for

$8000.00; in 1905 he sold the Pittsburgh seam of coal under-
lying the two tracts for $3609.70; and in October, 1910, he
sold the surface of the two tracts for $3680.00.   About three
months after the sale of the surface, January 9, 1911, plain-
tiff went to defendant's store at Brown and asked for a set-
tlement, and he, thinking she referred to a settlement of the
store account, replied that he thought there was very little
due, but being informed that she referred to her interest in
the land and when she exhibited to him the letter of 1887,
wherein he agreed to divide, he became somewhat angry, de-
nied that he owed her anything and replied, "Maybe I can
show you something you don't know nothing about."    He
then went to his safe and took therefrom and read the fol-
lowing paper:

> "This is to certify that we have this day received
> (in hand paid) from T. C. Bennett One Hundred and
> Seventy-five Dollars, in full of all claims, dues or ac-
> counts, and further that we hereby acknowledge the
> above amount to be full liquidation for all claims or
> interest that we might have heretofore had in any
> real estate claimed or owned by said T. C. Bennett,
> and we hereby acknowledge that the above T. C. Ben-
> nett owes us nothing in any way and that we have no
> interest or title to any land owned by said T. C. Ben-
> nett; and further, that we agree and bind ourselves,
> to give peaceable and full possession of the house that
> we now reside in, on or before March 1, 1891, as wit-
> ness the following signatures and seals.
> 
> AI P. BENNETT, (Seal)
> MARY A. BENNETT, (Seal)
> 
> This October 19, 1890.
> Witnesses:
> 
> J. C. Bennett,
> H. E. Bennett."

Plaintiff denied having signed the paper, or that she had any
knowledge whatever of its existence.   A heated controversy
followed in which defendant advised plaintiff she had bet-
ter be careful about insisting on a settlement, or she would
get herself into trouble.   Two witnesses were present.   De-

fendant did not claim there was no contract or no understanding by which he was to account for profits, but relied upon the release. From that time until after the death of her husband in 1917, no further effort was made by plaintiff to assert her rights. She accounts for this delay because she feared (after some of her family had taken counsel from a lawyer), that her husband might be prosecuted, or caused trouble, for having signed her name to the release without her knowledge or consent. Her suit was instituted in 1918, after a further effort to procure a settlement between the date of the death of her husband and that year. There seems to be very little controversy over the fact that Ai, the husband, signed plaintiff's name to the release of 1890. Defendant so testifies. An effort was, made to bring knowledge of his act to plaintiff.. One of the alleged witnesses, J. C. Bennett, is her son, but he denies that he signed his name to the paper, and says he had no knowledge of its existence. The other subscribing witness, H. E. Bennett, a son of defendant, is dead. On cross-examination, plaintiff stated that she saw the check for $175.00, but that her husband stated to her that it was an advancement or payment upon her interest in the land. There is no doubt that there was an agreement that defendant should account for one-half of the profits, if a sale should be made, and the release relied upon being defensive, the burden is upon defendant to establish its genuineness and validity. This burden has not been successfully carried. The fact that defendant took a release imports acknowledgment that plaintiff and her husband had an interest in the land. His contention is that he had no contract or agreement with her, that he was dealing with his brother, her husband, and addressed his letter of March 11, 1887, to him. If she had no interest in the land which defendant recognized, why did he have her husband to sign her name to the release? Why do a vain thing? His answer to this is that he always understood that the wife's name should be signed to all papers relating to an interest in land in order to be effective. He knew the land belonged to her, and that her hus-

band had no interest therein except an inchoate right of curtesy. We think it is reasonably clear that defendant was dealing with both the plaintiff and her husband, and that the arrangement as evidenced by the letter of March 11, 1887 to Ai was for the benefit of both. The subject matter of the agreement belonged to her, and any contract or agreement relating thereto necessarily took her into consideration. They could not trade her out of her interest without her concurrence, or participation. Usually, propositions affecting the wife's property are made through the husband, and especially is this true where the property is the home, in which both are vitally interested. The property cannot be disposed of without their joint consent. She had been endeavoring to save her home and had approached defendant with a different proposition from that contained in his letter to her husband. The legal effect is practically the same as if the proposition had been addressed to her. And she says his proposition was "taken up," meaning that she and her husband had accepted it. It was the best she could do.

We think the circumstances surrounding the parties and their acts, about which there is not very material conflict, as shown by the evidence, considered in connection with defendant's proposition as contained in his letter of March 1887, accepted by plaintiff and her husband and afterwards acted upon by defendant, made a contract in writing between plaintiff and defendant and created an express trust wherein defendant was trustee and plaintiff was beneficiary. *Wilson* v. *Kennedy,* 63 W. Va. 1; *Currence* v. *Ward,* 43 W. Va. 367; *Ruckman* v. *Cox.* 63 W. Va. 74; *Newman* v. *Newman,* 60 W. Va. 371; *Nease* v. *Capehart,* 8 W. Va. 95. But whether the contract is in writing or by parol an express trust may be created, and it may be proven by parol. *Currence* v. *Ward,* 43 W. Va. 367. "A trust, as the basis of an equitable title to real estate, may be proved by clear and satisfactory parol evidence, and in such case, the statute of frauds does not apply." *Hamilton* v. *McKinney,* 52 W. Va. 317. The learned judge of the lower court in deciding this point said: "Whether it was a trust in real estate or a trust in person-

alty, that is, a trust in the land itself or in the proceeds to be derived from a sale of the land, would seem not to be material. This is true, whether there be a memorandum in writing or not, if personalty, the common law has always recognized the sufficiency of a parol agreement, and if it be a trust in realty, the seventh section of the English statute of frauds not being embraced in our statute of frauds, it is the law of West Virginia that a trust operating upon real estate is not within the statute and therefore may be by parol." See *Floyd* v. *Duffy,* 68 W. Va. p. 339 and cases cited.

It is contended that plaintiff's claim is barred by laches; that she permitted defendant to remain in possession of the property without claim or complaint from 1887 until 1911, and for twenty-eight years after the execution of the release of 1890 until she began her suit in 1918. It must be remembered that it is not shown that she had any knowledge of the "release" until 1911, except by inference. Neither the statute of limitations nor laches will apply to an express trust until there is a denial or repudiation of the trust, of which the beneficiary has notice; after that time the statute begins to run and the doctrine of laches will apply. *Ruckman* v. *Cox,* 63 W. Va. 74; *Newman* v. *Newman,* 60 W. Va. 371; *Speidel* v. *Henrici,* 120 U. S. 227; *Gapen* v. *Gapen,* 41 W. Va. 422; Wood on Limitations, sec, 200. Trusts are peculiarly the subject of equity jurisdiction; and direct or express trusts, so long as they continue as between trustee and the beneficiary, are not subject to the statute of limitations. *Partridge* v. *Wells,* 30 N. J. Eq. 176; the doctrine being that the possession of the trustee is the possession of the *cestui que trust;* subject to qualification that when there is a denial of the trust plain and unequivocal the statute of limitations runs against the beneficiary from the time the repudiation is brought to his knowledge. *Kane* v. *Bloodgood,* 7 Johns. Chy. 90 (N. Y.), opinion by Chancellor Kent. There was no substantial reason why any action should have been taken by plaintiff or any demand made for an accounting prior to the sale of the oil and gas in 1900. Nothing had been done with

the land, no sale had been made although it was placed upon the market.' Plaintiff's interest in the land remained unchanged as it existed in 1887, in the hands of defendant as her trustee. Possession of the trustee is possession of the *cestui que trust*. But time is not the controlling factor in applying the doctrine of laches. A defendant who invokes the defense must show that he is put at a disadvantage in making his defense because of the flight of time. The rights of third parties have not intervened. The parties have preserved their documentary evidence. The contract on which the parties acted, as stated in the letter of 1887, is not denied and has been preserved. The release of 1890 was carefully preserved by defendant in his safe. The only material witness to this transaction who is dead is Ai P. Bennett, who signed his wife's name, and it is most likely that his testimony would have been of more benefit to plaintiff than defendant, and would have been conclusive that her name was signed by him without her authority, and that she did not know of its existence until 1911 when she made demand for accounting. Defendant knew of her demand, that she was persisting in it, and if his brother's evidence was in his favor it could have been perpetuated. After the demand in 1911, it is significant that he made a gift of $700.00 to his brother. He was living at the time she made the demand, and it does not appear that he ever contradicted her want of knowledge of its existence. If she had been informed of such a paper, it is not likely that she would have made such a demand, and defendant seemed to be under the impression that he had something in his safe of which she was not aware, and "didn't know nothing about". Where an express trust has been established, there is much authority to the effect that laches will not begin to be applicable until the trust is fully executed. *Floyd* v. *Duffy*, 68 W. Va. 339. There is no hard and fast rule for the application of the doctrine of laches. Each case depends upon its own circumstances. We do not think the doctrine applies under the circumstances of this case. See *Depue* v. *Miller*, 65 W. Va. 120.

It is asserted by defendant's counsel that if any trust ever

existed it became fully executed immediately upon the making of the sales, and receipt of the proceeds, and that plaintiff had an adequate remedy at law upon a mere legal demand; citing *Mankin* v. *Jones,* 68 W. Va. 422; *Annon* v. *Brown,* 65 W. Va. 34; *Hoke* v. *Davis,* 33 W. Va. 485; and *Newman* v. *Ruby,* 54 W. Va. 381. It must be remembered that the bill charges and the answer admits that defendant still owns a portion of the oil and gas underlying the lands, and, since about the year 1900, has been receiving royalties therefrom under the lease to the South Penn Oil Company, and an accounting of these royalties is sought. The trust has not been fully executed and hence equitable jurisdiction is conferred. But it appears that a repudiation of the trust, denial of plaintiff's claim, and denial of defendant's liability was made in the year 1911. The oil and gas, coal and surface had then been sold for definite sums, and for her one-half thereof plaintiff could have maintained her action, as well as to establish her claim in the remainder of the subject matter of the trust, if her claim had been refused. The statute of limitations then began to run upon such refusal. There was concurrent jurisdiction in equity and at law and in such cases equity follows the law and applies limitation as at law. *Newberger* v. *Wells,* 51 W. Va. 624; *Maxwell* v. *Wilson,* 54 W. Va. 495. This action was not instituted until 1918. Assuming that an action at law accrued to plaintiff for her part as each of the sales was made, would not the limitation bar her? Or assuming that her right of action began after the last sale was made in 1910, would she not then be barred? Plaintiff's excuse for delay is that after she made her demand in 1911, and discovered the existence of a release of her interest in the land, to which her husband had signed her name without her authority or knowledge, she feared she would cause him serious trouble if she asserted her right in the courts. Consideration for her husband's good name and standing in the community, for the continued harmony between them as man and wife, and for the peace of the family impelled her to desist. The suggestion of defendant that she might get into trouble if she was not careful in

what she was doing, coupled with advice of counsel that her husband by his act had possibly become liable to prosecution, had its effect.   Does the statute of limitations run against a married woman under such circumstances?   But would she be compelled to assert her claim when the sales of portions of the property were made in 1900, 1905 and 1910, under penalty of the running of the statute of limitations?   Assuming that she knew of such sales, was it incumbent upon her to make demand for her share as each sale was consummated, or be barred?   These sales by him did not change the trust relation.   The proceeds in his hands took the place of the portions sold.   The trust continued unimpaired.   Had she made demand after any sale, and had been refused, with denial of the trust, limitation would then begin to run.   She might have made the demand, but she was not compelled to do so at her peril.   The statute does not run against a depositor of money in bank until a demand is made and payment refused.   Wood on Liens, sec. 142.   "A mere retention by the trustee of a portion of the income of a trust fund, with consent of the *cestui que trust* and without any pretense that it is retained upon a claim of right, does not produce such hostile attitude."   *Dyer* v. *Waters,* 46 N. J. Eq. 484.   And it must be remembered that it was not until 1910, when disposition had been made of nearly all of the property.   Only one half of the royalty in the oil and gas then remained and that was being converted into money, the oil and gas then being extracted by a lessee.   For some years prior thereto, oil and gas had been found, and the royalties thereon remaining unsold had been paid defendant as the development and depletion progressed.   "The statute of limitations does not begin to run in favor of the trustee and against the beneficiary in personal property until the trustee does some act in open hostility to the trust, indicating a purpose to repudiate his obligation and assert an individual right to the property constituting the corpus of the estate."   Wood, Limitations, sec. 220b (2).   It is uniformly held that a beneficiary of an express trust is not barred by the statute from compelling the trustee to account, unless there has been an

unequivocal repudiation of the trust. *McClear's Will,* 147 Wis. 60; *Greenleaf* v. *Land & Lumber Co.* 146 N. C. 505; *Rickman* v. *Cox,* 63 W. Va. 74 (*supra*); *Walson* v. *Payne,* 143 Mo. App. 721; *Parks* v. *Satterwaite,* 132 Ind. 411; *And. rews* v. *Tuttle,* 191 Mass. 461; *Townsend* v. *Crowner,* 125 N. Y. Supp. 329; *Jones* v. *Lemon,* 26 W. Va. 629.

We have been greatly aided by able briefs of counsel on rehearing, upon the question of exemption of a married woman from the statute of limitations, under section 16 of chapter 104 of the Code, which provides:

> "If any person to whom the right accrues to bring any such personal action, suit or scire facias, or any such bill to repeal a grant, shall be, at the time the same accrues, an infant, married woman, or insane, the same (except in the case of the married woman, as provided in section three of this chapter) may be brought within the like number of years after his becoming of full age, unmarried, or sane, that is allowed to a person having no such impediment, to bring the same after the right accrues, or after such acknowledgment as aforesaid, except that it shall in no case be brought after twenty years from the time when the right accrues."

Under section three of that chapter, where a married woman has the right to make entry on or sue for land which is her sole and separate property, her coverture does not stop the running of the time of limitation. Here is an express provision that the ten years limitation shall operate against her right to make entry on or sue for land which is her sole and separate property; but is there such express provision in respect to her personal actions in section sixteen above quoted, which is designed to exempt persons under disability from the operation thereof? What is the meaning and effect of the parenthetical expression, "except in the case of the married woman, as provided in section three of this chapter," as therein contained? In this connection we have considered chapter 66 of the Code, and especially section 15 thereof, which provides that a married woman may sue

and be used in any court of law or chancery, which may have jurisdiction of the subject matter, the same in all cases as if she were a *feme sole*.  In many of the states it has been held that the acts giving married women the right to sue and be sued in all matters concerning their sole and separate estate, by implication repeals their exemption from the operation of the statutes of limitation.  The decisions in the various states are divergent upon this question based partly upon the differences in the statutes, but chiefly as to the interpretation and purpose of the exceptions in favor of married women in the statutes of limitation.  The courts of Illinois, Maine, Michigan, Nebraska, Pennsylvania and Tennessee have held that the expeditions in favor of married women have been repealed by implication by reason of the statutes conferring property rights and rights of action on married women.  The opposite view has been adopted in Kentucky, Missouri, New Jersey, North Carolina, Ohio, Oregon, Wisconsin and Wyoming. *Big Sandy Co.* v. *Ramey,* 162 Ky. 236; *Lindell Real Estate Co.* v. *Lindell,* 142 Mo. 61; *Carey* v. *Patterson,* 47 N. J. L. 365; *Wilkes* v. *Allen,* 131 N. C. 279; *Morrison* v. *Holladay,* 27 Ore. 175; *Wescott* v. *Miller,* 42 Wis. 454; *Blier* v. *Boswell,* 9 Wy. 57.  To the same effect is the text in 2 Wood on Limitations (4th Ed.) sec, 240, as follows: ''In those States in which married women are excepted from the operation of the statute, the circumstance that they are by statute clothed with the power of suing and being sued, or even endowed with all the privileges, rights and liabilities of a *feme sole,* would hardly seem to be sufficient to change the rule, or deprive them of the benefits of the disability if they choose to avail themselves of it; and the circumstance that the legislature has clothed them with these rights, without making any change in the statute of limitations with respect to them, indicates an intention on the part of the legislature that they shall still remain within the exception contained therein.''  The main reasons for and against the doctrine of implied repeal, are concisely stated in the cases of *McIrvin* v. *Lincoln Memorial University* (Tenn.) 197 S. W. 862, and *Lindell Real Estate Co.* v. *Lin-*

*dell,* 142 Mo. 61, 43 S. W. 368. A review of the decisions of the different states will be found in L. R. A. 1918C, p. 191, in a foot note to the McIrvin case, which is there reported.

Upon consideration of our own statute of limitations, and the so-called "married woman's act," we would not have much difficulty in coming to the conclusion that section 16 of chapter 104 exempted married women from the operation of that statute as to actions regarding her sole and separate personal property, as that section includes her in a class which is exempted, namely, "infants and insane persons," and provides that suits may be brought after the infant shall become of lawful age, the married woman unmarried, and the insane person sane, except that in no case shall such suit be brought after 20 years from the time when the right accrues, if it was not for the parenthetical clause therein contained, which says, "except in the case of a married woman, as provided in section three of this chapter." By reference to the Code of Virginia of 1849, chap. 149. it will be seen that a married woman could bring an action for entry on or to recover land within 10 years after the time her disability ceased to exist; and that she could institute personal action, or *scire facias,* or file a bill to repeal a grant, after her discoverture, but not later than 20 years from the time when the right accrued. It appears that it was not until 1868 that the right of a married woman to make entry on or bring action to recover land was limited to 10 years by the parenthetical clause which says, "except in the case of a married woman where such land is her sole and separate property;" and she was not limited as to personal actions until after discoverture, (except the 20 year period from the time when the right accrued) until the adoption of the Code of 1868, which contains the parenthetical clause above referred to in section 16. What meaning or effect, then, shall we give to these parenthetical clauses which first appeared in the Code of 1868? It is clear that she is limited to 10 years, although she is under coverture, where her suit is for entry upon or recovery of land which is her sole and separate property. The meaning of the parenthetical clause, contained in sec.

16, which has reference to personal actions, is not so plain. It says, "except in the case of the married woman, as provided in section three of this chapter." Section three refers to a married woman's *land,* which is her sole and separate property.

Under the well known rule of statutory construction we must give this parenthetical clause some meaning and effect. What actions are saved to her from limitation, and conversely, what actions subject thereto? Under section three the actions there saved are those which do not affect her separate and sole property in land. Her sole and separate property as then defined, consisted of all real and personal property theretofore *conveyed* directly to her or to a trustee for her use, by *any person other than her husband.* Sec. I chap. 66, Code 1868. Also the real and personal property which she had at the time of her marriage remained her separate property. Sec. 2 chap. 66, Code 1868. By section three of the same chapter she might take by inheritance, gift, grant or devise from any person *other than her husband,* and hold the same to her sole and separate use. So it appears that all property of a married woman, notably, that inherited by her prior to 1868, and that which had been conveyed to her directly by her husband, was not declared to be her separate and sole property. The common law as to all of her property was not entirely abrogated by the married woman's act; and suits as to such property, not made sole and separate, were not barred by section three of the statute of limitations, except as to the 20 year period, until the prescribed time after discoverture. Under section three both in the Code of 1868 and in our present Code, suits concerning her sole and separate property in land are subject to the limitation, in the former 15 years, in the latter 10 years. Section 16, under consideration, treats of personal actions, and by means of the parenthetical clause therein, namely, "except in the case of a married woman, as provided in section three of this chapter," makes the same exception as to her personal estate. It is an "exception upon an exception." It was intended to place personal actions concerning her sole and separate per-

sonal estate in the same situation as suits concerning land which is her sole and separate property, with respect to limitation. The intention and meaning could have been much more clearly expressed, it is true, and we have had considerable trouble in construing it. Any other construction would make the parenthetical words meaningless. We conclude that it was the intention of the legislature to apply limitation to personal actions of a married woman concerning her sole and separate personal property, and to exempt therefrom, during coverture, actions concerning her property which is not sole and separate, until discoverture, or until barred by the 20 year period. This court has had this statute under consideration where claims of the wife against her husband were sought to be barred, by other creditors of the husband, who were seeking to collect their debts against him. *Bank* v. *Atkinson,* 32 W. Va. 203, involved a claim of a bank against Atkinson, whose wife had delivered to him proceeds of her separate estate without taking from him any evidence thereof, or without herself keeping any account of the sums; afterwards he became insolvent, and purchased real estate, procured title thereto to be conveyed to his wife, and borrowed money for himself thereon, securing payment by deed of trust. A judgment had been obtained against him before the purchase, and it was held that the real estate was liable to the judgment. It was said in the opinion that if, when the purchase was made, her debt was barred by limitation, that circumstance would tend strongly to repel her claim to the land against the creditors. It was not decided that her claim was barred, the decision being based on other grounds. In *Miller* v. *Cox,* 38 W. Va. 747, the insolvent husband, while being sued by his creditors, encumbered his real estate by a deed of trust to secure an alleged loan of long standing from his wife, and we find similar expressions as to the claim of the wife being barred by limitation. However, in *Righter* v. *Riley,* 42 W. Va. 633, the cases of *Bank* v. *Atkinson* and *Miller* v. *Cox* were criticised as inadvertently containing admissions that a wife's claim against her husband was subject to limitation as if she were a *feme sole.* And this case holds

that: ''The claim of a wife against her husband is not barred by the statute of limitations during coverture, if at all, until 20 years from the original inception or written renewal thereof.'' (1st pt. Syl.). In *Mynes* v. *Mynes,* 47 W. Va. 681, we find the last three cases cited, considered and reviewed by Judge McWHORTER, who argues against the conclusion reached in point 1 of the Righter case. The *Myncs* case was decided on the point that the statute of limitations began to run on the notes of the husband (given to a third party and afterwards assigned to the wife) before they came into the wife's hands; and consequently, limitation having begun to run, no subsequent disability would interrupt it. In a concurring note by Judge DENT, he disagreed with Judge McWHORTER's argument against the decision in the Righter case. The court did not decide this apparent disagreement, as it was not necessary in the decision of the case. The Righter case was not overruled. However, in the Mynes case in discussing secs. 3 and 16 of chap. 104, Code, Judge McWhorter says: ''Sec. 16 of said chapter 104, relating to limitation of personal actions, is section 15 of said chapter 149, Code 1860, re-enacted, with the like parenthetical change; except in the case of a married woman, as provided in sec. 3 of this chapter; that is, *in personal actions relating to her sole and separate property*: In *Phillips* v. *Piney Coal Co.,* 53 W. Va. 543, Judge McWHORTER quotes from *Gibson* v. *Herriott,* 55 Ark. 85, which holds that, under the constitution and statutes of that state a married woman's claim is barred by laches and limitation, the disabilities of coverture in respect to her separate estate having been removed. We have not examined the constitution and statutes of Arkansas on which this decision is based. See also *Swiger* v. *Swiger,* 58 W. Va. 119, where *Righter* v. *Riley,* 1st pt. syl. seems to be quoted with approval. We are not concerned in the instant case as to what effect chapter 104 has upon the limitation of a wife's right of action against her husband, during coverture. It does not arise here, but has an incidental bearing, and for that reason these decisions have been considered. We are cited by defendant's counsel to *Ball* v. *Bullard,* 52 Barb. (N.

Y.) 141 (1868), as binding authority on this court, inasmuch as our married woman's act was taken from the New York statute, which had been interpreted by that decision prior to our adoption of the act; and it is argued that the parenthetical clauses were interpolated to forestall litigation. But later, in *Clark* v. *McCann,* 18 Hun. 13 (N. Y.) the case of *Ball* v. *Bullard* was disapproved; and in 1870 the legislature of New York struck out married women from among the class of persons against whom the statute of limitations did not run.

Having concluded that coverture of plaintiff does not prevent the running of the statute, and that it began to run from the date of the repudiation of the express trust, and denial of liability by defendant in 1911, what period of limitation applies? It is insisted that the five year limit should be invoked under *Somers* v. *Bennett,* 68 W. Va. 157, which was a suit by one co-tenant against another co-tenant of land held by them for sale and profit, for an accounting of the proceeds and profits, and the five year period was applied from the time plaintiff had right to demand payment. In the instant case we have a contract in writing signed by defendant, in which he agreed to "divide the profits even" when the land is sold, and we think sec. 6 of chapter 104 applies, which says that every action to recover money founded on a contract in writing, signed by the party to be charged thereby, or by his agent, but not under seal, shall be brought within ten years after the right to bring the same shall have accrued. The promise to pay is in writing. *Brown* v. *Grove,* 80 Fed. 564.

Error in the decree is asserted because the court ascertained one half of the money derived from the three sales and took therefrom the money originally paid by defendant at the trustee's sale, $867.06, the advancements or gifts made to Ai by defendant, $1,375.00, and rendered judgment for the remainder, with interest thereon from January 9, 1911, without referring the cause to a commissioner for an accounting; and also because interest was not calculated and allowed defendant on the sums paid. The items of debit and credit

by which the amount of the judgment was determined are undisputed, and it was a matter of calculation, and we perceive no necessity for reference for that purpose. If there were any other items or claims which should have been taken into account, the pleadings fail to disclose them. The court disposed of the matter of interest, by finding that a calculation of interest on the sums would be to the disadvantage of defendant, and under the circumstances would be unfair to him. If that be true, (and counsel does not point out wherein the court was mistaken in that conclusion) defendant cannot complain of an error in his favor. Moreover, if there be just claims to which defendant is entitled, we now perceive no reason why they may not be determined under the reference already ordered.

Appellee makes cross assignment of error because the lower court allowed defendant credit for two items, one of $500.00 and the other of $700.00, which were acknowledged to have been received by plaintiff, (paid to her husband), but which defendant stated to be gifts, and not as part payment on any obligation, legal or moral. However, plaintiff in the 26th paragraph of her bill says she is willing to credit these sums on the amount found to be due her, if it be equitable so to do; and in view of the facts, we do not feel disposed to disturb the decree of the chancellor in that regard. He found it equitable so to do. Nor will we make a neat and careful calculation of the interest on the various payments, to see if the court made inconsequential error.

Appellant makes the point that plaintiff's claim is void and unenforceable under the rule against perpetuities, in that under the agreement, plaintiff's claim or interest, at its inception is inchoate, executory and contingent upon the happening of conditions precedent, any one or all of which might or might not come to pass, namely, (1) the purchase of the land at the trustee's sale, (2) the subsequent resale by defendant at a profit. No time limit upon resale was agreed upon by the parties, but the time and terms of sale were left wholly to defendant. It is contended that under the agreement plaintiff's inchoate interest might not have vested

until twenty one years and ten months after the death of the parties to the agreement. We think that plaintiff's interest in the land became vested and certain when the property was purchased at the trustee's sale. Whether it was in the land or in the proceeds of the land when sold, is immaterial. Although no time for resale was agreed upon, the law would not permit defendant to prevent a fruition of the contract by indefinite and eternal postponement. "Nothing is uncertain which is capable of being made certain." The element of uncertainty in the profits or losses has no relevancy to the rule against perpetuities. "The rule against perpetuities has reference to the time within which the title vests, and has nothing to do with the postponement of the enjoyment." 21 R. C. L. p. 290, sec. 12.

We affirm the decree.

*Affirmed.*